438 Mass. 387 (2003)                                     387

First Justice of the Bristol Juvenile Court *v.* Clerk-Magistrate of the Bristol Juvenile Court.

First Justice of the Bristol Division of the Juvenile Court Department & another[1] *vs.* Clerk-Magistrate of the Bristol Division of the Juvenile Court Department & others.[2]

Suffolk. October 10, 2002. - January 7, 2003.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Supreme Judicial Court,* Superintendence of inferior courts. *Constitutional Law,* Separation of powers. *General Court. Chief Justice for Administration and Management. Clerk of Court. Trial Court,* Chief Administrative Justice, Probation officers. *Statute,* Construction.

This court chose to exercise its broad "inherent common law and constitutional powers to supervise the administration of justice" to decide this case, which concerned an internal dispute between members of the judicial department, raised important issues with implications for the effective administration of justice, and stated an important matter of public interest that could cause further uncertainty within the courts. [391]

Discussion concerning certain statutes enacted by the Legislature to modify other statutes governing clerk-magistrates, assistant clerks of court, and probation officers in aspects of their relationship with various administrative Trial Court justices. [391-395]

Description and definition (as far as needed to decide this case) of the doctrines of separation of independent branches of State government (as stated in, and guaranteed by, art. 30 of the Massachusetts Declaration of Rights) and the inherent power of the judiciary. [395-398]

Discussion of the roles of clerks, assistant clerks, and probation officers in the court system. [398-401]

Statement of the defendants' view that certain statutes enacted by the Legislature to modify other statutes governing clerk-magistrates and assistant clerks of court in aspects of their relationship with various administrative Trial Court justices were not actually or potentially invasive of constitutionally protected judicial authority, but were simply clarifications of preexisting powers and statutorily authorized duties of clerks. [401-403]

This court concluded that certain statutes enacted by the Legislature to modify other statutes governing clerk-magistrates (clerks) and assistant clerks of court in aspects of their relationship with various administrative Trial Court justices did not impermissibly infringe on a judge's inherent author-

[1]First Justice of the Springfield Division of the District Court Department.
[2]Clerk-magistrate of the Springfield Division of the District Court Department and the Commissioner of Probation.

ity under art. 30 of the Massachusetts Declaration of Rights to challenge the qualifications of appointments made by clerks and to supervise and control clerks and assistant clerks serving in the Trial Court. [403-406]

This court concluded that certain statutes enacted by the Legislature to modify other statutes governing probation officers in aspects of their relationship with various administrative Trial Court justices did not impair a judge's authority under art. 30 of the Massachusetts Declaration of Rights to exercise physical control over the court room, to control a judge's own proceedings, or to compel court officers to carry out their duties, and did not impinge on the substantial authority of the Chief Justice for Administration and Management with regard to the appointment of probation officers. [406-408]

This court declined to hold that the Legislature's use of so-called "outside sections" in a general appropriations bill to modify other statutes governing clerk-magistrates, assistant clerks of court, and probation officers in aspects of their relationship with various administrative Trial Court justices violated art. 63 of the Amendments to the Massachusetts Constitution. [408]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on December 24, 2001.

The case was reported by *Greaney*, J.

*William L. Patton (Martin J. Newhouse & Emily C. Shanahan* with him) for the plaintiffs.

*Richard S. Weitzel*, Assistant Attorney General (*Stephanie S. Lovell*, Assistant Attorney General, with him) for the defendants.

*Carl Valvo*, for Association of Magistrates and Assistant Clerks of the Trial Court, amicus curiae, filed a brief.

GREANEY, J. We are concerned here with a claim that certain statutes enacted by the Legislature to modify other statutes governing clerk-magistrates (clerks), assistant clerks of court, and probation officers in aspects of their relationship with various administrative Trial Court justices should be declared unconstitutional because they infringe on inherent powers of the judiciary in contravention of art. 30 of the Massachusetts Declaration of Rights. There is a further claim that the challenged laws are independently unconstitutional because they were enacted by means of so-called "outside sections" in a general appropriation bill in violation of art. 63 of the Amendments to the Massachusetts Constitution. The case was reported by a single justice on the record created by the parties in the county court. We conclude that the modifying statutes (statutes),

as construed in this opinion, are constitutional against the facial challenges made. We decline to hold that art. 63 was violated by the manner in which the statutes were enacted.

The background of the case is as follows. On November 21, 2001, the Legislature approved the Commonwealth's budget for fiscal year 2002. See St. 2001, c. 177. Amendments to existing legislation relating to the organization of the court system were included as part of the budget enactment. Challenged here are those "outside sections" that appear to call into question the authority of the Chief Justice for Administration and Management (CJAM), and Chief Justices and First Justices of various departments of the Trial Court, over clerks and assistant clerks of court; the role of the CJAM in the selection and appointment of assistant clerks; and the authority of the CJAM and First Justices over probation officers serving in the Trial Court. See St. 2001, c. 177, §§ 34-36, 39-41, 45-47, 52-54 (the challenged statutes).

On December 10, 2001, the First Justice of the Bristol Division of the Juvenile Court Department (First Justice of the Bristol Division) filed a pro se petition in the county court, alleging that the challenged statutes impermissibly undermine the ability of the trial court judiciary to control and supervise clerks, assistant clerks, and probation officers. The pro se complaint alleged instances of ongoing strife in the Bristol Juvenile Court between the First Justice of the Bristol Division and the clerk-magistrate, in order to demonstrate that the effective administration of justice requires, among other considerations, a judge's ability to ensure that clerks and assistant clerks in his or her court perform their duties in a professional manner. The pro se complaint also alleged that the statutes act to insulate appointments in the clerk's office and in the probation department from meaningful judicial oversight to the end that impermissible political patronage appointments seriously undermine "the ability of the court to do its real work." The pro se complaint sought a declaration that the statutes are unconstitutional on their face because they impermissibly infringe on authority inherent in the judicial branch in violation of art. 30.

The First Justice of the Bristol Division, joined by the First Justice of the Springfield Division of the District Court Depart-

ment as an additional plaintiff, thereafter filed an amended complaint, asserting that the statutes (1) establish an "independent and unaccountable" clerk and clerk's office that is removed from the superintendence and administrative authority of the judiciary in the trial court; and (2) eliminate the authority of the CJAM to appoint, dismiss, and assign probation officers in the trial court, as well as the authority of First Justices to promote, suspend, discipline, or recommend the discharge of probation officers serving in their respective court rooms. In addition, the amended complaint alleged that the manner in which the statutes were enacted, by way of their inclusion as "outside sections" in a general appropriation bill, was in violation of art. 63. The amended complaint sought relief from this court, acting under its general superintendence power. See G. L. c. 211, § 3.

The defendants filed a motion to dismiss, asserting that this court lacked any basis to assume jurisdiction. The defendants claimed that, in the absence of an actual controversy or any particularized injury, the plaintiffs raised non-justiciable issues. According to the defendants, the amended complaint is "nothing more than a unilateral request for an advisory opinion." The defendants asserted that this court's general superintendence powers under G. L. c. 211, § 3, are not so broad as to permit this court to strike down a statute as unconstitutional in the absence of an actual dispute. Moreover, the defendants argued that, as State officials, the plaintiffs lack standing to raise their constitutional claims. Both parties filed motions for summary judgment and the single justice reserved and reported the case on the record.

We shall first deal with the procedural issues raised by the defendants' motion to dismiss, concluding that the case should be decided on its merits. We shall then decide the merits by analyzing the statutes under the standards applicable to facial constitutional challenges and recognized principles of statutory construction, after identifying what they actually do; the nature and scope of art. 30 and the inherent powers of the judiciary; the role of clerks, assistant clerks, and probation officers in the judicial process; and the views of the parties as to the effect of the statutes, concluding, on the construction we give to the statutes, that they are constitutional. Finally, we shall discuss

the plaintiffs' art. 63 challenge, concluding that the statutes' enactment did not expressly violate that constitutional provision.

1. There is no question that the case poses a serious dispute concerning the administration of justice. The original pro se complaint contains allegations that, if true, present an immediate conflict between the First Justice of the Bristol Division and the clerk-magistrate of that court. Additionally, an amicus brief filed on behalf of the Association of Magistrates and Assistant Clerks of the Trial Court makes extensive reference to the merits of a case pending in the county court in which relief is sought to resolve a concrete controversy involving the First Justice of the Malden Division of the District Court Department, the clerk-magistrate of that court, the Chief Justice of the District Court Department, and the CJAM. We take judicial notice of the papers in this county court case, and, after examining them, ascertain that the case presents an actual dispute that, in one form or another, implicates some of the challenged statutes and that has generated collateral litigation in the United States District Court for the District of Massachusetts. Further, the Legislature undoubtedly presumed the constitutionality of the statutes. Without derogating in any respect from the principles relied on by the defendants in their motion to dismiss concerning general procedural requirements to obtain relief, we conclude that this case concerns an internal dispute between members of the judicial department, see *County Comm'rs of Bristol* v. *Judges of Probate of Bristol County*, 338 Mass. 738, 741-742 (1959); raises important issues with implications for the effective administration of justice, see *Messing, Rudavsky & Weliky, P.C.* v. *President & Fellows of Harvard College*, 436 Mass. 347, 351 (2002); and states an important matter of public interest that may cause further uncertainty within the courts, see *Wellesley College* v. *Attorney Gen.*, 313 Mass. 722, 731 (1943). Accordingly, we exercise our broad "inherent common law and constitutional powers to supervise the administration of justice" to decide the case. *Foley* v. *Lowell Div. of the Dist. Court Dep't*, 398 Mass. 800, 804 (1986).[3]

2. (a) The challenged statutes, set forth in full as an Appendix

[3]This court ordinarily would not render an advisory opinion on its own initiative. See *Bunker Hill Distrib., Inc.* v. *District Attorney for the Suffolk*

to this opinion, make the following changes to existing statutes. Sections 34-35, 40, and 45-47 of c. 177 address the authority of First Justices and clerks in the various departments of the Trial Court over the internal administration of the clerk's office. Prior to the enactment of c. 177, the statute defining the powers of First Justices generally, see G. L. c. 211B, § 10A, inserted by St. 1992, c. 379, § 80, as well as statutes specific to the First Justices in the various divisions of Trial Court departments, see G. L. c. 185C, § 8, as amended through St. 2000, c. 159, §§ 248, 249 (Housing Court); G. L. c. 218, § 6, as amended through St. 2000, c. 159, §§ 265-267 (District Court); and G. L. c. 218, § 58, as amended through St. 2000, c. 159, §§ 271-275 (Juvenile Court), contained identical language which read, "provided, however, that clerks shall have responsibility for the internal administration of his office, including personnel, staff services and record keeping."

The challenged legislation inserts identical language into each of the above statutes, so that they now read "provided, however, that clerks shall have responsibility for the internal administration of his office, including *the selection, appointment, and management of* personnel, staff services and record keeping" (emphasis added). See St. 2001, c. 177, § 34 (amending G. L. c. 185C, § 8), § 40 (amending G. L. c. 211B, § 10A), § 45 (amending G. L. c. 218, § 6), and § 47 (amending G. L. c. 218, § 58). Section 35 adds similar language to G. L. c. 185C, § 9, which describes the powers of the clerk-magistrate in a

*Dist.*, 376 Mass. 142, 145 (1978); *Cole* v. *Chief of Police of Fall River*, 312 Mass. 523, 526 (1942), appeal dismissed sub nom. *Cole* v. *Violette*, 319 U.S. 581 (1943). We note that other State Supreme Courts have, by a procedure styled as a "direct letter of address," alerted a State Legislature or Governor of circumstances where the court was constrained by the separation of powers doctrine from executing a legislative mandate. See *In re Chapter 515, Pub. Laws of 1985*, 12 Media L. Rep. 2067, 2069 (Me. 1986) (regarding Maine bill requiring promulgation of rules allowing photographic and electronic media coverage of court proceedings); *In re 1976 PA 267*, 400 Mich. 660, 663 (1977) (regarding Michigan open meeting law); *In re Court of Appeals*, 372 Mich. 227, 229 (1964) (regarding impending legislation that would have divided counties into elective districts for court of appeals); *Matter of Head Notes to Opinions*, 43 Mich. 641, 642-644 (1881) (regarding statutory requirement that justices of Michigan Supreme Court prepare syllabus for every opinion published); *In re 42 Pa. C.S. § 1703*, 482 Pa. 522, 529-532 (1978) (regarding Pennsylvania public open meeting law).

division of the housing court. See St. 2001, c. 177, § 35 (amending G. L. c. 185C, § 9).[4] See also St. 2001, c. 177, § 46 (adding identical language to statute defining powers and responsibilities of Chief Justice of Boston Municipal Court, amending G. L. c. 218, § 51A).

Section 41 inserts two new sections into G. L. c. 211B. The first, § 10B, consists of six subsections describing the process whereby the appointments of assistant clerks are to be made and reviewed. Prior to the enactment of § 41, these appointments had been made by clerks in the respective divisions, subject to the approval of the CJAM for compliance with the personnel standards of the Trial Court. See G. L. c. 211B, § 8, as amended by St. 1992, c. 379, § 76; G. L. c. 218, § 10, as amended by St. 2000, c. 236, §§ 25, 25A (District Court); G. L. c. 218, § 53, as amended through St. 1999, c. 127, § 175 (Boston Municipal Court); G. L. c. 218, § 58, as amended through St. 2000, c. 159, §§ 271-275 (Juvenile Court).[5] Subsection (*a*) of § 10B now provides that clerks have the "exclusive authority to select and appoint assistant clerks in the district court, juvenile court, housing court and Boston municipal court," and that "such authority shall not be subject to the review or approval of any other person, except as provided in this section." St. 2001, c. 177, § 41. Under subsection (*b*), "[u]pon the appointment of an assistant clerk," the clerk forwards notice to the CJAM, together with (i) a certification of "compliance with the personnel standards promulgated pursuant to [G. L. c. 211B, § 8,][6] and in effect as of July 1, 1998, with respect to job posting, newspaper advertising, review of applications, interviewing applicants, reference checks, verification of eligibility to work in the United States, and criminal record checks" and (ii) a certification of sufficient funding to

---

[4]The statutes do not apply to elected clerks in the Superior Court or to elected registers in the Probate and Family Court.

[5]There was one exception to the above procedure — in the Housing Court, an assistant clerk's appointment was "subject to the approval of the first justice," and was removable "at his pleasure or at the pleasure of the chief justice." G. L. c. 185C, § 11, as amended by St. 1992, c. 379, § 50. Section 36 of c. 177 deletes the quoted words.

[6]These standards are set forth in the Personnel Policies and Procedures Manual of the Trial Court.

support the position. Under subsection (*c*), the CJAM has twenty-one days to review the appointment, "solely for compliance with the specific personnel standards promulgated pursuant to [G. L. c. 211B, § 8,] and in effect as of July 1, 1998, that deal expressly with job posting, newspaper advertising, review of applications, interviewing applicants, reference checks, verification of eligibility to work in the United States, and criminal record checks." Any appointment not disapproved by the CJAM within twenty-one days is deemed approved. Subsection (*d*) provides that disputes between a Chief Justice, or a First Justice, and a clerk, concerning the appointment of personnel in the clerk's office, shall be submitted to the CJAM. The CJAM is required to conduct a hearing within thirty days, and her determination on the matter "shall be binding on the parties." Subsection (*e*) allows for review, by a single justice of this court, of an unfavorable decision by the CJAM. Finally, subsection (*f*) provides that the provisions of § 10B "shall operate notwithstanding any other provision of law and shall not be construed to limit the appointment power conferred by law to any appointing authority within the trial court with respect to the appointment of personnel not specifically governed by this section." St. 2001, c. 177, § 41, inserting G. L. c. 211B, § 10B.

Also added by § 41 of c. 177, is § 10C, which states that "[t]he general superintendence and administrative authority of the [CJAM], the chief justices of the respective departments of the trial court and the first justices of particular courts shall not include the authority or power to exercise, supersede, limit, prevent the exercise of or otherwise affect any of the powers, duties and responsibilities of the clerks or registers of probate in any general or special law, including laws authorizing or governing the selection and appointment of personnel, except where expressly authorized." St. 2001, c. 177, § 41, inserting G. L. c. 211B, § 10C.

The remaining challenged statutes relate to the authority of the CJAM and First Justices with respect to probation officers in the various department of the trial court. Section 39 strikes G. L. c. 211B, § 9 (xxxv), which had provided, in part, that the CJAM had the power to appoint up to one hundred associate

probation officers. Section 45 amended G. L. c. 218, § 6, which had stated that "[a]s administrative head of his court, the first justice shall be responsible for the management of the courthouse and shall have control over all personnel employed therein; provided, however, that the clerk shall have responsibility for the internal administration of his office, including personnel, staff services and record keeping." That portion of G. L. c. 218, § 6, as amended, now reads "provided, however that the clerk shall have responsibility for the internal administration of his office, including the selection, appointment, and management of personnel, staff services and record keeping; and provided, further, that the commissioner of probation shall have the authority to appoint, dismiss, assign and discipline probation officers and associate probation officers within the several sessions of the trial court."

Section 52 replaced G. L. c. 276, § 83, which authorized the CJAM to appoint, dismiss, and assign probation officers to sessions of the trial court as deemed necessary, and authorized the First Justice of any court having two or more probation officers to designate one as chief probation officer and another as assistant chief probation officer, and the authority to suspend or discipline any such probation officer. The former § 83 also permitted a First Justice to recommend to the CJAM that a particular probation officer be discharged. The new § 83, as appearing in § 52 of c. 177, gives the Commissioner of Probation (commissioner) the power to appoint, dismiss, and assign probation officers to the several sessions of the trial court as he deems necessary, and to designate chief probation officers and assistant chief probation officers. Section 83, as amended, also provides "that said commissioner may suspend or discipline any such probation officer."[7]

(b) It is now appropriate to describe and define (as far as

---

[7]With respect to probation officers in the Probate and Family Court Department, G. L. c. 276, § 85A, prior to c. 177, began "[i]n addition to other duties imposed upon him by the justices of the probate court, a probation officer of the probate court may, when ordered to do so by the court, examine all records and files in divorce . . . ." Section 53 of c. 177 struck the words "imposed upon him by the justices of the probate court" and leaves the remainder of the section intact. With respect to probation officers in the Boston Juvenile Court, G. L. c. 276, § 86, prior to c. 177, provided that the

needed to decide this case) the doctrines of separation of independent branches of State government (as stated in, and guaranteed by, art. 30), and the inherent powers of the judiciary. The two doctrines are interdependent, although not coextensive in most situations.

(i) Although art. 30, by its express terms, prohibits the Legislature from exercising "judicial powers," we have never interpreted the doctrine of separation of powers to require an absolute division of the legislative and judicial functions. See *Opinion of the Justices*, 365 Mass. 639, 641 (1974). The Legislature has considerable authority, under Part 2, c. 1, § 1, arts. 3 and 4 of the Massachusetts Constitution, to "erect and constitute judicatories and courts of record" and to "name and settle . . . all civil officers," and to "exercise wide regulation, supervision, and control over courts not established by the Constitution." *Dolan* v. *County of Suffolk*, 310 Mass. 318, 324 (1941). The Legislature may, within its constitutional authority, enact periodic reforms designed to achieve a more efficient and fair court system. See *Opinion of the Justices*, 372 Mass. 883, 904 (1977). See also *Opinion of the Justices*, 314 Mass. 767, 772 (1943). What art. 30 forbids — "the essence of what cannot be tolerated" — is legislative interference with the judiciary's core functions. *Chief Admin. Justice of the Trial Court* v. *Labor Relations Comm'n*, 404 Mass. 53, 56 (1989), quoting *Opinion of the Justices*, 365 Mass. 639, 642 (1974). Prohibited as well is legislation that attempts to restrict or diminish those judicial powers that are necessary to the court's ability to perform its core judicial functions. See *Gray* v. *Commissioner of Revenue*, 422 Mass. 666, 672 (1996); *New Bedford Standard-Times Publ. Co.* v. *Clerk of the Third Dist. Court of Bristol*, 377 Mass. 404, 411 (1979); *Commonwealth* v. *Jackson*, 369 Mass. 904, 921-922 (1976). See also *Brach* v. *Chief Justice of the Dist. Court Dep't*, 386 Mass. 528, 535 (1982).

(ii) Article 29 of the Massachusetts Declaration of Rights states that "[i]t is essential to the preservation of the rights of

---

Justice of that court "may appoint as many deputy probation officers, without salary, as he may deem desirable." Section 54 of c. 177 prefaces the above language with the words "subject to the approval of the commissioner of probation."

every individual, his life, liberty, property and character, that there be an impartial interpretation of the laws, and administration of justice." In addition, art. 11 of our Declaration of Rights guarantees to every citizen the right to "obtain right and justice freely, and without being obliged to purchase it; completely, and without any denial; promptly, and without delay; comformably to the laws." It is from these lofty principles that flows the concept of inherent judicial powers, "whose exercise is essential to the function of the judicial department, to the maintenance of its authority, [and] to its capacity to decide cases." *Gray* v. *Commissioner of Revenue, supra,* quoting *Brach* v. *Chief Justice of the Dist. Court Dep't, supra.* Inherent judicial authority is "not limited to adjudication, but includes certain ancillary functions such as rule-making and judicial administration, which are essential if the courts are to carry out their constitutional mandate." *O'Coin's, Inc.* v. *Treasurer of the County of Worcester,* 362 Mass. 507, 510 (1972). Although inherent powers may be recognized by statute, they exist independently, because they "directly affect[] the capacity of the judicial department to function" and cannot be nullified by the Legislature without violating art. 30. *Opinion of the Justices,* 279 Mass. 607, 613 (1932). See *Brach* v. *Chief Justice of the Dist. Court Dep't, supra.*

The boundaries of inherent judicial authority have been marked by decisions of this court, in cases challenging a particular power exercised by the judiciary, see, e.g., *Jake J.* v. *Commonwealth,* 433 Mass. 70, 78 (2000), or determining, as here, whether a statute is invalid under art. 30. The scope of inherent judicial authority reaches beyond traditional adjudicatory powers and encompasses (but is not limited to) the court's power to commit the fiscal resources of the Commonwealth and other governmental agencies necessary to ensure the proper operation of the courts, see *O'Coins, Inc.* v. *Treasurer of the County of Worcester, supra*; the power to make rules governing the internal organization of the courts and to control the practice of law, see *Collins* v. *Godfrey,* 324 Mass. 574, 575 (1949); and the power to control and supervise personnel within the judicial system, see *Matter of Antonelli,* 429 Mass. 644, 649 (1999). The last is perhaps the least controversial and includes a judge's

power to "to control [a court's] own proceedings, the conduct of participants, the actions of officers of the court and the environment of the court." *Chief Admin. Justice of the Trial Court* v. *Labor Relations Comm'n, supra* at 57, quoting *State* v. *LaFrance,* 124 N.H. 171, 179-180 (1983).

(c) Into this scheme, we fit the roles of clerks, assistant clerks, and probation officers. Duties of clerks and assistant clerks are in large part ministerial, yet, at the same time, inextricably related to the work of the courts. See *Commonwealth* v. *O'Neil,* 418 Mass. 760, 765 (1994); *Opinion of the Justices,* 300 Mass. 596, 598 (1938). The clerk is responsible for attendance at sessions of the court, maintenance of a record of its proceedings, and care and custody of records, books, and papers. See G. L. c. 218, § 12. Although not judicial officers, see *Matter of Dugan,* 418 Mass. 185, 189 (1994), clerks and assistant clerks in various departments of the Trial Court nevertheless perform highly important functions. Their authority includes the power to grant continuances; to hear and rule on uncontested nonevidentiary motions; to hold pretrial conferences; to mediate, hear and decide small claims; to hold preliminary hearings to determine whether there is probable cause to believe that a probationer has violated the terms of his probation; to conduct show cause hearings on certain applications for criminal complaints; to pass on the appropriateness of applications for warrants; and to set bail in certain circumstances. See G. L. c. 221, § 62C; G. L. c. 218, §§ 21, 22, 33, 35A; G. L. c. 276, §§ 57, 58. In *Massachusetts Bar Ass'n* v. *Cronin,* 351 Mass. 321, 326 (1966), this court considered whether the public good required a clerk's removal from office under authority conferred on this court by G. L. c. 211, § 4, and stated the following as to clerks:

> "The duties of a clerk of a court are performed, for the most part, under public scrutiny. He is a conspicuous figure in the court room. He is seated prominently near the judge, where he is in frequent consultation with him as well as with various lawyers. He administers oaths to witnesses. In our opinion, it would be incongruous to hold out as

clerk one who has not conformed to the standards essential to every court."[8]

Because the proper performance of a clerk's duties, ministerial and otherwise, is essential to the effective functioning of a court, it is imperative that a judge possess inherent authority to ensure that clerks and assistant clerks perform their jobs faithfully and in a professional manner. See *Commonwealth* v. *O'Neil, supra* at 765; *Opinion of the Justices,* 300 Mass. 596, 598 (1938).[9] As was stated by one commentator concerning the authority of this court: "If the SJC has ample [inherent] power to supervise and, in appropriate circumstances, to impose disciplinary sanctions on judges whose conduct departs from acceptable standards, it seems beyond dispute that lesser functionaries within the system could be dealt with similarly. Thus, the supervisory power could include clerks of court, despite the fact that most of them hold elective offices." Harvey, The Inherent Power to Reform: An Essay on the Massachusetts Judiciary, 77 Mass. Law Rev. 8, 17 (1992).

The work of probation officers, like that of clerks and assistant clerks, is intimately connected to the existence and function of the judiciary. See *Massachusetts Probation Ass'n* v. *Commissioner of Admin.,* 370 Mass. 651, 657 (1976). Probation officers investigate backgrounds of criminal defendants, prepare presentence reports, and, when appropriate in the probation officer's judgment, recommend to a judge that any person

[8]The high standards that clerks are called to uphold now are embodied in the Code of Professional Responsibility for Clerks of the Courts, S.J.C. Rule 3:12, as amended, 427 Mass. 1322 (1998).

[9]Other State courts have agreed. The Supreme Court of Oklahoma characterized a court clerk as the "arm of the court" and recognized an administrative judge's inherent authority over the performance of a clerk's duties in the following statement: "[T]he clerk is ultimately connected to the existence, dignity and function of the judiciary. It is entirely contrary to the centralized, hierarchial, and well organized structure of the state judiciary for the court clerk to be a 'loose cannon sliding around on the county's judicial deck.' " *Petuskey* v. *Cannon,* 742 P.2d 1117, 1121 (Okla. 1987), quoting *Rutledge* v. *Workman,* 175 W.Va. 375, 381 (1985). See also *Price* v. *Superior Court,* 186 Cal. App. 3d 156, 171 (1986) ("Emphasis of the important duties performed by the court clerk would be incomplete if the clerk's relationship to the judge were not mentioned. Constant reliance must be placed on the skill, attention and faithfulness of the courtroom staff. This occurs not only in the courtroom, but also in chambers where much court business is conducted").

convicted be placed on probation, and on what terms. See G. L. c. 276, §§ 85, 87. A probation officer carries out the sentence of the court when that sentence involves a term of probation. He or she is responsible for record-keeping and monitoring probationers placed in the officer's care by the court with respect to their compliance with conditions of probation. Probation officers also usually make the initial determination whether a probationer has violated the conditions of probation, and initiate and present evidence in surrender proceedings.

Other services performed by probation officers in the Juvenile Court Department include the role of record-keeping and monitoring in delinquency cases (see G. L. c. 119, §§ 57, 67, 68), evaluation, informal assistance, service referral and monitoring in child in need of services cases (see G. L. c. 119, §§ 39E, 39G, 39H), and their case management, home study, and child protective services in care and protection cases (see G. L. c. 119, § 26). Probation officers in the Probate and Family Court Department are responsible for enforcement of support and maintenance payments, and have full power to initiate contempt proceedings, if necessary, to collect delinquent payments, and investigate and make findings as to the condition of minor children under the court's supervision. See G. L. c. 276, §§ 85A, 85B.

The above list is not meant to be exhaustive; as a general matter, probation officers are required to "perform such other duties as the court requires." G. L. c. 276, § 85. In a practical sense, "[t]he duties of each probation officer are defined and informed by the specific instructions of the sentencing judge." *A.L.* v. *Commonwealth*, 402 Mass. 234, 242 (1988). The timely and proper performance of these duties cannot be overestimated. "Although it is the function of the sentencing judge to set the conditions of probation, the conditions are meaningless without the probation officer's enforcement." *Id.*

Probation officers play a critical role in maintaining the effectiveness of probation orders and in proceedings when probation orders have been violated. The importance of their role with respect to the latter is reflected in the following observation: "Probation violation proceedings are among the most important matters within [the Trial Court's] jurisdiction. The

timely and proper conduct of these proceedings is essential to protect the rights of probationers as set forth in [F]ederal and [S]tate law, as well as to maintain the credibility, and thus the effectiveness, of probation orders. Just as fundamentally, the proper and timely conduct of probation violation proceedings is necessary to vindicate the public trust. Failure of the court to take appropriate action when a convicted defendant who has been given the benefit of probation is then alleged to have violated that order erodes public confidence in the judicial system." Commentary to Rule 1 of the District Court Rules for Probation Violation Proceedings (2001). It thus is essential that a judge possess the authority to supervise closely the performance of probation officers and to ensure that probation services, both in and out of the courtroom are, on the whole, carried out efficiently and fairly. See *Chief Admin. Justice of the Trial Court* v. *Labor Relations Comm'n*, 404 Mass. 53, 57 (1989). See also *Massachusetts Probation Ass'n* v. *Commissioner of Admin.*, *supra* at 657-658 ("day-to-day and ultimate control over probation officers is vested in the judiciary, including the justices of the courts where the probation officers serve").

What can be distilled from the above are the following principles. First, clerks, assistant clerks, and probation officers perform duties essential to the processing of cases and, in the larger picture, the successful functioning of the Trial Court and the proper administration of justice. Second, judges' authority to control and supervise judicial personnel includes inherent authority, independent of statute, to ensure that clerks, assistant clerks, and probation officers serving in their courts are qualified and possess the skills and competence to enable them to perform their duties in a professional manner and in conformity with governing statutes, rules, orders, and standards of accountability. Third, any attempt by the Legislature to restrict or nullify this inherent authority would likely be void under art. 30.

(d) Against this background, the plaintiffs view the statutes as creating an expansive intrusion on the powers of the judiciary. They state that the statutes relating to clerks and assistant clerks purport "to strip [judges] of the authority to direct and supervise

clerks" and, in so doing, establish clerks as "autonomous and co-equal entit[ies] within the judiciary." With respect to probation officers, the plaintiffs argue that the statutes deprive First Justices of the inherent authority to supervise and control probation officers serving in their courts. The defendants, significantly in our opinion, view the statutes addressing clerks much more narrowly, stating, in various language in their brief, that the statutes are not actually or potentially invasive of constitutionally protected judicial authority, but are simply clarifications of preexisting administrative powers and statutorily authorized duties of clerks. The position taken by the defendants is that the statutes do not render clerks immune from well-established judicial authority over court house personnel. In the defendants' own words, the challenged statutory modifications regarding clerks do not "remotely . . . suggest that judges are powerless to oversee the work of clerks and to make sure that they are doing their job and doing it properly," and the statutory modification regarding probation officers, "by its plain terms, does not purport to alter the power of judges to direct or supervise probation officers while in the courtroom or to promptly curtail any misbehavior or insubordination on the part of such officers." The defendants also express the view that "it is doubtful that the language [in the statutes regarding the clerks' authority to appoint and supervise personnel in his or her office] effects any change in the law at all."

The Legislature, in enacting the statutes, did not intend to exceed pertinent constitutional boundaries. We, therefore, accept the defendants' narrow view of the scope of the statutes. Having done so, we are now in a position to construe the facial significance of the statutes against the challenges made. We do so under the recognized standards governing a facial constitutional challenge which were recently enumerated in *Blixt* v. *Blixt*, 437 Mass. 649, 652 (2002). Also relevant to our analysis are the principles that related statutes are to be construed to create a harmonious whole and that any ambiguities that exist are to be resolved in a manner that effectuates the intent of the Legislature and that permits the statute to be found constitutional. See *Registrar of Motor Vehicles* v. *Board of Appeal on Motor Vehicle Liab. Policies & Bonds*, 382 Mass. 580,

585 (1981); *First Nat'l Bank* v. *Attorney Gen.*, 362 Mass. 570, 578 (1972). Our task is made easier by the fact that the plaintiffs' claim appears to be limited to the effect of the modifications on a judge's ability to manage, supervise, and control clerks, assistant clerks, and probation officers. Significantly, the plaintiffs do not assert that the scope of inherent judicial power includes the exclusive power to select or appoint assistant clerks and probation officers.

(e) The basic art. 30 question before us then with regard to the statutes relating to clerks, is whether the statutes impermissibly infringe on a judge's inherent authority to challenge the qualifications of appointments that a clerk wishes to make and to supervise and control clerks and assistant clerks serving in the Trial Court.

The language inserted by §§ 34-35, 40, and 45-47 of c. 177, does not alter the relationship between First Justices and clerks in the Trial Court. The language simply clarifies that a clerk's preexisting authority over the internal management of his or her office includes the "selection, appointment, and management" of personnel. As conceded by the defendants, it does not limit the independent authority of a First Justice as administrative head of his or her court (and a departmental Chief Justice) to supervise the conduct of judicial personnel, including the clerk and assistant clerks, and to oversee activity within the realm of judicial administration that takes place in and out of the court room.

Section 41 institutes more obvious, but nevertheless modest, alterations to the preexisting statutory scheme. Section 10B (*a*) of G. L. c. 211B reiterates that clerks are the sole appointing authority for assistant clerks in their courts. Neither the CJAM, First Justices or departmental Chief Justices are empowered to appoint assistant clerks on their behalf. This is not a new proposition, nor is it constitutionally offensive. The remaining subsections of § 10B expressly confirm the continuing responsibility and authority of the judiciary to ensure that personnel standards created pursuant to G. L. c. 211B, § 8, are followed, both procedurally and substantively, with respect to appointments of assistant clerks, with the objectives, succinctly stated in the Trial Court manual, of hiring the most qualified

candidates from a wide pool of applicants and of providing all candidates with equal employment opportunity.[10] The CJAM's review of proposed assistant clerk appointments will not only ensure compliance with procedural requirements, but will, in the words of the defendants, "also provide an opportunity for the CJAM to raise with a [clerk] any general concerns that she may have concerning a particular appointment." In order to reach an informed decision on these matters, the CJAM will consult with First Justices of individual courts, and, when appropriate, the Chief Justice of the department, and any other source or resource necessary or helpful to her approval of any proposed appointment of an assistant clerk submitted to her.

In this latter aspect, § 10B also contemplates that First Justices and departmental Chief Justices will continue to play an independent role in the selection and appointment of assistant clerks. The language of § 10B (*d*) expressly permits First Justices and Chief Justices to submit to the CJAM disputes with clerks concerning all personnel appointments in the clerks' offices (including the appointment of assistant clerks), with a right of appeal from the CJAM's decision to a single justice of this court as provided for in § 10B (*e*). Thus, primary responsibility to ascertain the substantive qualifications of candidates for assistant clerks lies with the First Justice of the pertinent division and the departmental Chief Justice, both of whom are more likely to be in a better position than the CJAM

---

[10]It of course remains open to the CJAM to make revisions in the personnel standards, by means of her broad authority under G. L. c. 211B, § 8, to establish and promulgate standards for the appointment of personnel within the Trial Court (except judges, clerks and registers of probate), including, where not otherwise prohibited, the creation of stricter minimum qualifications for Trial Court positions. It would be incongruous to limit her oversight authority to standards set in that version of the Trial Court's Personnel Policies and Procedures Manual in effect as of July 1, 1998, the date set forth in § 10B (*b*) and (*c*). The manual cannot be frozen in time, and, in fact, the version dated July 1, 1998, is not the most recent one. (The newest personnel manual was published in May, 2001.)

That this is so is demonstrated by the Legislature conferring on the CJAM the authority to establish standards for the appointment of Trial Court personnel, a power it would not logically have conferred if it meant to withhold the authority to enforce the personnel standards with respect to the appointment of assistant clerks. See *Jake J.* v. *Commonwealth*, 433 Mass. 70, 77-78 (2000).

to assess the needs of the affected court and the ability of the prospective appointee to meet those needs.

In summary, § 10B merely reconfigures the way in which the judiciary exercises its authority to ensure compliance with procedural and substantive standards for the appointment of assistant clerks, in order that standards of professionalism in the clerk's office and, ultimately, the integrity of the Trial Court, be maintained. See *Massachusetts Bar Ass'n* v. *Cronin*, 351 Mass. 321, 326 (1966). If the First Justice and the departmental Chief Justice conclude, on review of the prospective appointee, that he or she is qualified for the appointment, and no other impediment in the personnel manual or the law exists, the appointment may proceed subject to the certification requirements set forth in § 10B (*b*) and (*c*) for ultimate approval by the CJAM. If either disagrees with the clerk that a candidate is properly qualified for the responsibilities of the position, the disagreement is submitted to the CJAM for her resolution pursuant to § 10B (*d*). Section 10B (*d*) contemplates that the CJAM will actually "determine" the dispute and her decision shall be "binding." Similarly, the opportunity for an "appointing authority aggrieved" by the CJAM's determination to appeal the determination to a single justice, as provided by § 10B (*e*), confirms that the CJAM has the authority to make a substantive decision on such a matter that could "aggrieve" the appointing clerk. Section 10 (*d*), therefore, is the source, and the procedural route, for the CJAM to enforce substantive requirements pertaining to the qualifications of the candidates that a clerk seeks to appoint.[11]

Section 10C of G. L. c. 211B does not limit what has been expressed above. That provision states that the "general superintendence and administrative authority" of the CJAM, Chief Justices, and First Justices cannot be used to "supersede, limit, [or] prevent the exercise of or otherwise affect any of the pow-

---

[11]We also point out that clerks remain obligated to make appointments on the basis of merit. The Code of Professional Responsibility for Clerks of the Courts, S.J.C. Rule 3:12, imposes on a clerk the independent responsibility to ensure that standards set by the CJAM in the procedures manual are carried out. Canon 2 provides that a clerk must comply with lawful directives of the CJAM and Canon 3 (B) requires a clerk to make all personnel appointments "on the basis of merit, and in compliance with applicable personnel standards."

ers, duties or responsibilities of the clerks or registers of probate in any general or special law, including laws authorizing or governing the selection and appointment of personnel, except where expressly authorized."[12] In light of the defendants' concessions, § 10C merely states the obvious — that any power of judicial superintendence statutorily accorded to the CJAM, Chief Justices, or First Justices, may not be used to supersede that authority statutorily accorded to clerks over administrative matters specific to their own offices. The statutes purport to make no changes (nor could they) in the settled power of this court under G. L. c. 211, § 3, and its constitutional supervisory authority, and the authority of Trial Court judges to challenge unqualified candidates and to supervise, direct, and review the work of clerks and assistant clerks in performing their important duties, some of which have been described earlier in this opinion, in accordance with governing laws, rules, regulations, standards, and practices, because those functions, when so performed, relate directly to the court's adjudicatory functions.

(f) We come now to the statutes relating to probation officers. The core amendment is § 52, which transfers authority to appoint probation officers from the CJAM to the commissioner. The plaintiffs claim that, by omitting language present in the former G. L. c. 276, § 83, that expressly authorized First Justices, where appropriate, to suspend, discipline, and recommend the discharge of a probation officer, § 52 deprives First Justices of their inherent authority to supervise and control probation officers.

We construe the statute to speak solely to channels of administrative authority within the department of probation, and not to the ability of judges to direct and supervise probation officers assigned to their court rooms or promptly to address any misbehavior on the part of such officers. The statute does not,

---

[12]The term "general superintendence" has heretofore been reserved to describe powers of this court derived from the Constitution and authorized by G. L. c. 211, § 3. We view the reference to "general superintendence," in the context of G. L. c. 211B, § 10C, to mean only that supervisory authority conferred on the CJAM, Chief Justices, and First Justices by statute. That supervisory authority that is inherent in the function each performs in the judiciary, discussed above, exists, of course, irrespective of any title accorded by statute.

therefore, impair a judge's authority to exercise physical control over the court room, to control a judge's own proceedings, or to compel probation officers to do their job. *Commonwealth* v. *O'Neil*, 418 Mass. 760, 764-765 (1994). In the same way, authority expressly assigned to the commissioner by § 45, cannot, consistent with art. 30, be construed to impinge on the ability of First Justices to maintain their own authority in their respective courts. Interpreted narrowly to preserve these core inherent powers intact, the statutes "lack[] the degree of intrusiveness that calls art. 30 into play." *Chief Admin. Justice of the Trial Court* v. *Labor Relations Comm'n*, 404 Mass. 53, 57 (1989).

It is important to note here that the CJAM retains substantial authority with regard to the appointment of probation officers. In the first place, the Legislature did not amend G. L. c. 276, §§ 98 and 99. The CJAM, therefore, retains the power to appoint the commissioner and substantial authority to supervise and direct the performance of all his duties, including the selection of probation officers. The CJAM also retains the broad authority stated in G. L. c. 211B, § 9, including superintendence of the administration of the Trial Court and personnel management. As discussed with respect to the appointment of clerks, it remains entirely within the CJAM's power to establish a set of conditions that the commissioner would be required to follow in the appointment of probation officers, including strict compliance with all aspects of the personnel manual.

We add one observation. Unresolved friction between a judge and personnel serving in his or her court room, owing to any uncertainty regarding their respective statutory responsibilities, allowed to escalate, can have a profoundly detrimental effect on the court and its ability to administer justice. At this point in time, it is enough to say that the plaintiffs have not demonstrated a concrete basis on which to declare the amendments made by the challenged statutes unconstitutional under art. 30. Any disputes involving the authority of the CJAM, Chief Justices, or First Justices over clerks, assistant clerks, or probation officers that may arise in the future will be adjudicated under the narrow interpretation of the challenged statutes set forth in this opinion. In the meantime, the CJAM (in collaboration with First Justices and departmental Chief Justices) is to monitor and

ensure that appointments falling under the statutes are made on their merits in conformity with governing requirements and standards, and that performance remains subject to the supervision of judges.

3. We decline to hold in this case that the manner in which the statutes were adopted violates art. 63. Even assuming the doubtful proposition that the plaintiffs have standing to raise this claim, see *Clean Harbors of Braintree, Inc.* v. *Board of Health of Braintree*, 415 Mass. 876, 878-879 (1993); *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 610 (1983), in the absence of an express prohibition in art. 63, we are reluctant to reject the use of "outside sections" as a means to enact amendments to general legislation. "This court traditionally has avoided involvement in the internal workings of the Legislature in deference to the unique role of the Legislature and its expertise with regard to internal legislative processes." *Powers* v. *Secretary of Admin.*, 412 Mass. 119, 125 n.7 (1992). See *LIMITS* v. *President of the Senate*, 414 Mass. 31, 35 (1992); *Backman* v. *Secretary of the Commonwealth*, 387 Mass. 549, 555 (1982). "In these circumstances, mindful of the principle of separation of powers so carefully stated in art. 30 of the Declaration of Rights, this court should not infer specific constitutional procedures that the . . . legislative branch[] . . . must follow." *Id.* This case presents no special circumstances that would warrant an examination of the constitutionality of all "outside sections." See *Opinion of the Justices*, 411 Mass. 1201, 1215 (1991); *Brookline* v. *The Governor*, 407 Mass. 377, 381-382 n.5 (1990); *Opinion of the Justices*, 384 Mass. 820, 826 (1981).

4. The case is remanded to the single justice for the entry of a suitable judgment in the county court in accordance with this opinion.

*So ordered.*

APPENDIX.

Chapter 177. AN ACT MAKING APPROPRIATIONS FOR THE FISCAL YEAR 2002 FOR THE MAINTENANCE OF THE DEPARTMENTS, BOARDS, COMMISSIONS, INSTITUTIONS AND CERTAIN ACTIVITIES OF THE COMMONWEALTH, FOR INTEREST, SINKING FUND AND SE-RIAL BOND REQUIREMENTS AND FOR CERTAIN PERMANENT IMPROVEMENTS.

" . . .

"SECTION 34. Section 8 of chapter 185C of the General Laws, as so ap-pearing, is hereby amended by striking out the third sentence and inserting in place thereof the following sentence:- Said first justice shall be the administra-tive head of that particular court and shall have the power, authority and responsibility of a first justice as set forth in section 10A of chapter 211B; provided, however, that clerks shall have responsibility for the internal administration of his office, including the selection, appointment, and manage-ment of personnel, staff services and record keeping.

"SECTION 35. Section 9 of said chapter 185C, as so appearing, is hereby amended by striking out the fourth sentence and inserting in place thereof the following sentence:- Said clerks shall have responsibility for the internal administration of their respective offices, including the selection, appointment, and management of personnel, staff services and record keeping.

"SECTION 36. Section 11 of said chapter 185C, as so appearing, is hereby amended by striking out the first sentence and inserting in place thereof the following sentence:- The clerk of a division of the housing court department may appoint 1 or more assistant clerks, who shall be removable at his pleasure.

" . . .

"SECTION 39. The third paragraph of section 9 of said chapter 211B, as so appearing, is hereby amended by striking out clause (xxxv).

"SECTION 40. Section 10A of said chapter 211B, as so appearing, is hereby amended by striking out the first sentence and inserting in place thereof the following sentence:- A first justice, in addition to his judicial pow-ers and duties as a justice of the trial court and in addition to his general pow-ers of superintendence as first justice of a particular court within the trial court, shall, subject to the superintendence authority of the supreme judicial court as provided in section 3 of chapter 211 and the administrative authority of the chief justice of the first justice's department of the trial court, be the administrative head of his court; provided, however, that clerks, recorders and registers shall have responsibility for the internal administration of their respective offices, including the selection, appointment, and management of personnel, staff services and record keeping.

"SECTION 41. Said chapter 211B is hereby further amended by inserting after section 10A the following 2 sections:-

"Section 10B. (*a*) The exclusive authority to select and appoint assistant clerks in the district court, juvenile court, housing court and Boston municipal court shall be vested in the clerks of said courts and such authority shall not be subject to the review or approval of any other person, except as provided in this section.

"(*b*) Upon the appointment of an assistant clerk, the clerk shall forward

notice of said appointment to the chief justice for administration and management, together with (i) a certification of compliance with the personnel standards promulgated pursuant to section 8 and in effect as of July 1, 1998, with respect to job posting, newspaper advertising, review of applications, interviewing applicants, reference checks, verification of eligibility to work in the United States, and criminal record checks and (ii) a certification that sufficient funding is available in the current fiscal year budget to support the position as of the effective date of the appointment. No such appointment may be made in violation of the nepotism provisions of chapter 268A.

"(c) The chief justice for administration and management shall, within 21 days, review such appointments of assistant clerks solely for compliance with the specific personnel standards promulgated pursuant to section 8 and in effect as of July 1, 1998, that deal expressly with job posting, newspaper advertising, review of applications, interviewing applicants, reference checks, verification of eligibility to work in the United States, and criminal record checks. Any such appointment not disapproved by the chief justice for administration and management within 21 days of receipt of the appointing authority's notice of appointment and accompanying certifications shall be deemed to be approved.

"(d) Except for matters of compliance with the provisions of subsection (b), any dispute arising between a chief justice of a department or a first justice of a division, and a clerk of court, concerning the selection or appointment of personnel in the office of the clerk shall be submitted directly to the chief justice for administration and management in accordance with clause (xxx) of the third paragraph of section 9, provided that the chief justice for administration and management shall not refer such dispute to any other person, but shall conduct a hearing and determine such dispute within 30 days of receipt of the written notification of such dispute or within such other reasonable time as the chief justice for administration and management shall set with the agreement of the parties to the dispute. The decision of the chief justice for administration and management shall be made in accordance with the applicable provisions of law and shall be binding on the parties.

"(e) Any appointing authority aggrieved by a final determination of the chief justice for administration and management under subsection (c) or (d) or by the failure of the chief justice for administration and management to hear and determine a dispute within the time prescribed by subsection (d) may petition for appeal in the supreme judicial court sitting in Suffolk county by filing a copy thereof with the clerk of said court. Such petition for appeal shall be filed within 20 days after the date of receipt of such determination. Each claim of appeal shall set forth separately and particularly each error of law asserted to have been made by the chief justice for administration and management. Upon the entry of the appeal it shall be heard and determined by the court, which shall have jurisdiction to affirm, modify or set aside such determination in whole or in part, or remand the proceeding to the chief justice for administration and management with instructions.

"(f) The provisions of this section shall operate notwithstanding any other provision of law and shall not be construed to limit the appointment power conferred by law to any appointing authority within the trial court with respect to the appointment of personnel not specifically governed by this section.

"Section 10C. The general superintendence and administrative authority of the chief justice for administration and management, the chief justices of the respective departments of the trial court and the first justices of particular courts shall not include the authority or power to exercise, supersede, limit, prevent the exercise of or otherwise affect any of the powers, duties and responsibilities of the clerks or registers of probate in any general or special law, including laws authorizing or governing the selection and appointment of personnel, except where expressly authorized.

" . . .

SECTION 45. The fifth paragraph of [section 6 of chapter 218 of the General Laws, as appearing in the 2000 Official Edition], is hereby amended by striking out the second sentence and inserting in place thereof the following sentence:- As administrative head of his court, said first justice shall be responsible for the management of the courthouse and shall have control over all personnel employed therein; provided, however, that the clerk shall have responsibility for the internal administration of his office, including the selection, appointment, and management of personnel, staff services and record keeping; and provided, further, that the commissioner of probation shall have the authority to appoint, dismiss, assign and discipline probation officers and associate probation officers within the several sessions of the trial court.

"SECTION 46. Section 51A of said chapter 218, as so appearing, is hereby amended by inserting after the word "two hundred and eleven B", in line 9, the words:- ; provided, however, that the clerk shall have responsibility for the internal administration of his office, including the selection, appointment, and management of personnel, staff services and record keeping.

"SECTION 47. The second paragraph of section 58 of said chapter 218, as so appearing, is hereby amended by striking out the second sentence and inserting in place thereof the following sentence:- The first justice shall be the administrative head of his division; provided, however, that the clerks shall have responsibility for the internal administration of his office, including the selection, appointment, and management of personnel, staff services and record keeping.

"SECTION 52. Chapter 276 of the General Laws is hereby amended by striking out section 83, as so appearing, and inserting in place thereof the following section:-

"Section 83. Subject to appropriation, the commissioner of probation may appoint, dismiss and assign such probation officers to the several sessions of the trial court as he deems necessary. In any court having 2 or more probation officers, said commissioner may designate 1 probation officer to serve as chief probation officer and may designate other probation officers to serve as assistant chief probation officers, as he deems necessary for the effective administration of justice; provided, however, that said commissioner may suspend or discipline any such probation officer. The compensation of probation officers in the trial court shall be paid by the commonwealth according to schedules established in section 99B or in a provision of an applicable collective bargaining agreement.

"SECTION 53. Section 85A of said chapter 276, as so appearing, is hereby

amended by striking out, in lines 1 and 2, the words 'imposed upon him by the justices of the probate court'.

"SECTION 54. Section 86 of said chapter 276, as so appearing, is hereby amended by inserting after the word 'court', in line 1, the following:- subject to the approval of the commissioner of probation."